UNITED STATES of America, Plaintiff,

v.

Angel PEREZ–CASILLAS, Jaime Quiles-Hernandez, Rafael Moreno-Morales, Rafael Torres-Marrero, Luis Reveron-Martinez, Juan Bruno-Gonzalez, Nelson Gonzalez-Perez, William Colon-Berrios, Jose Rios-Polanco, and Nazario Mateo-Espada, Defendants.

Crim. No. 84–0070CC.

United States District Court,
D. Puerto Rico.

Aug. 22, 1984.

Daniel López-Romo, U.S. Atty. by Gary H. Montilla, Asst. U.S. Atty., Hato Rey, P.R., for plaintiff.

Francisco M. Dolz Sanchez, San Juan, P.R., Jose M. Ortiz, Eduardo Caballero Reyes, Jose C. Aponte, Wilfredo Figueroa, Federico Delgado Torres, Hato Rey, P.R., Teodoro Mendez Lebron, Santurce, P.R., Jose A. Torres Martinez, Hato Rey, P.R., William Arias, Rio Piedras, P.R., Carlos M. Mangual Lopez, Hato Rey, P.R., for defendants.

OPINION AND ORDER

CEREZO, District Judge.

On July 25, 1978 Carlos Soto-Arrivi and Arnaldo Dario Rosado died in a confrontation with the police at a mountain site known as Cerro Maravilla. This incident led to several investigations of possible police brutality and violation of civil rights by federal and local law enforcement authorities. These early investigations did not result in any criminal or disciplinary action against the policemen involved. In the year 1979 relatives of the deceased filed a civil rights complaint seeking damages against the policemen and other government officials which is still pending in this court. The policemen gave sworn testimony during the taking of depositions in the civil case, made statements to law enforcement officers and appeared before the grand jury during the initial investigations. Throughout those proceedings, they maintained that Soto-Arrivi and Rosado were killed in self-defense during a shootout while attempting to commit a terrorist act.

Prior to the elections of 1980, the local press reported statements attributed to the candidate for governor for the Popular Democratic Party promising to give top priority to this matter if elected.[1] Cerro Maravilla and its sequelae became one of the issues most debated during the 1980 local electoral campaign. Following that election, the Senate of Puerto Rico, presided by Popular Democratic Party leader Miguel Hernández-Agosto, launched an investigation of the Cerro Maravilla incidents and the Judiciary Committee, presided by Senator Francisco Aponte-Pérez, received testimony in executive sessions.[2] Public hearings were subsequently held from June 15, 1983 through the first days of December 1983. These hearings, televised on a commercial station, were paid by the Senate. They reached their climax when Miguel A. Marte, a television technician present at the time of the shoot out, and

---

1. *El Mundo,* October 24, 1979 Article by Bartolomé Brignoni under title "RHC asks Solicitor General of U.S. to Intervene in Cerro Maravilla Case."

2. On February 23, 1981 the Senate approved Resolution Number 91 ordering its Judicial Committee to carry on a complete investigation on the Cerro Maravilla incident.

three of the Cerro Maravilla policemen—Carmelo Cruz, José Montañez and Cartagena-Flores—requested and were granted immunity by the Senate of Puerto Rico and by the federal government. Their testimony brought forth a version of the facts which essentially contradicted that originally advanced by the policemen. Weeks later the grand jury returned a seventy-page indictment containing forty-four counts which is the basis of this case. The first count charges all ten policemen indicted with conspiring to obstruct criminal investigations and to give false testimony under oath.[3] The remaining counts charge the individual defendants with multiple instances of perjury and obstruction of justice. The backdrop to the perjury charges is the prior sworn testimony given by defendants before a grand jury summoned for an earlier investigation and deposition testimony in the Section 1983 action. The obstruction of justice charges refer to actions allegedly taken by defendants during the initial and recent criminal investigations which were supposedly intended to withhold evidence, alter testimonies and induce others to testify falsely. Each of the perjury charges contained in the indictment is, of course, juxtaposed against a final factual averment which is stated to be the truth. The statements embodied as *the* truth in the indictment follow closely the testimony of the witnesses and the data gathered before the Senate committee which conflicted, in varying degrees, with the original version of the events given by the defendants. The structure of the indictment reveals that to prove the perjury charges the July 25, 1978 scenario has to be reenacted during the trial of the instant case and the government bears the burden of proving, beyond a reasonable doubt, that what it states to be the truth is in fact what occurred.

The 1983 public hearings held by the Senate attempted to reenact that scenario.

The cumulative effect upon the community of the media coverage of the Cerro Maravilla events since the very day that they occurred gained added strength with the televised hearings held during a period of approximately five months.

Adverse pretrial publicity has been the basis of motions for continuance of trial filed by some of the defendants and joined by others, which have been opposed by the government. Codefendant Moreno-Morales filed the first of these motions claiming that the ongoing Senate investigation [4] and criminal proceedings related to police corruption have engendered aggressive and continuous publicity that places in jeopardy his Sixth Amendment rights. He requests that the trial date be continued until, at least, after the 1984 election. Similar grounds have been advanced by other defendants in support of their requests for continuance. The government, in its initial opposition to the postponement of trial,[5] claims that defendants have not made a specific, substantial showing of prejudice and have not shown that the excessive publicity cannot be cured by an extensive voir dire. In its June 14, 1984 motion to set a trial date the government emphasizes the fact that six years have elapsed since the underlying events which form the basis of the case took place and that the passage of time increases "the chances for fading memory, interference or tampering with witnesses or witnesses' unavailability." On July 6, 1984 the court advised all parties that, in considering and before ruling upon the motions for continuance and the opposition, it intended to take notice of the following:

1. The contents of all newspaper reports, editorials, photographs and illustrations published in newspapers of general circulation in Puerto Rico during the period

---

**3.** 18 U.S.C. Sec. 1503; 18 U.S.C. Sec. 1510; 18 U.S.C. Sec. 1621; 18 U.S.C. Sec. 1622 and 18 U.S.C. Sec. 1623.

**4.** Although the televised hearings ended in early December 1983, the Senate continues to investigate during executive sessions what it has called

the cover-up or "third stage." The President of the Senate was recently quoted as saying that the hearings will soon go public. (*San Juan Star*, 8–18–84, page 3)

**5.** The opposition was filed on May 18, 1984.

of 1979 to the present directly related to the Cerro Maravilla incident.

2. That the Senate hearings on the Cerro Maravilla incident held from June to December 1983 were televised by a private television channel and transmitted by radio broadcast. The prosecution replied on July 23, 1983 stating that it has no objection to the Court's taking judicial notice of the existence of publicity relating to Cerro Maravilla events, but does object to the taking of notice "of the character and effect of such publicity, particularly as a potential evidentiary basis on which to rule on defendant Moreno-Morales' motion for continuance." It urges that the accuracy of such publicity is generally highly questionable and unsuitable for judicial notice and that it is inappropriate "to rule upon the continuance motion on the basis of publicized items which are (a) not in the record, (b) not specifically designated and (c) clearly open to dispute with respect to accuracy and interpretation." It incorporates the grounds set forth in its previous opposition, mainly, absence of a showing of actual prejudice and its contention that continuances are unfavorably regarded in highly publicized cases.

■ The government's approach is misguided. The cases cited in support thereof deal with traditional judicial notice views which are wholly inapplicable to the situation now before us. In all three cases cited[6] the courts were dealing with the propriety of taking judicial notice of matters which were found to be subject to reasonable dispute. The court's order advising the parties of its intention to take notice of publicity related to this case was not directed to evidentiary matters. Unlike the courts in the cases cited by the government, we are not dealing here with adjudicative facts in the traditional meaning of Rule 201, Federal Rules of Evidence. Neither is the court concerned with the truth or falsity of media reports. What is important is that the reports, aside from their accuracy or veracity, influence the commu-

nity and create attitudes and beliefs. Furthermore, it is within the Court's legitimate function to make its own assessment of conditions created by pretrial publicity. To that end it must evaluate the nature of the materials publicized, the extent of its dissemination, its duration and its impact on the community from which potential jurors shall be drawn. The fact that defendants have not provided the court with a record of media coverage should not serve to negate the fact of its existence or bar the court from making its own estimate of it. It would be shunning reality not to recognize that the Cerro Maravilla events were followed by a deluge of publicity which has yet to abate. This much was recognized by our circuit as early as 1981 when it said: "Coming as it did in the midst of a heated debate over the Island's political future— and on the eve of a closely contested electoral campaign—the Cerro Maravilla incidents attracted widespread popular and political attention." *In Re San Juan Star*, 662 F.2d 108, 111 (1st Cir.1981). Again in 1983: "The incident at Cerro Maravilla had and has significant implications and has been the subject of intense media coverage and popular attention." *Colón-Berrios v. Hernández-Agosto*, 716 F.2d 85, 87 (1st Cir.1983).

■ The government contends, citing *Reed v. Rhodes*, 607 F.2d, at page 735, that the court errs in employing evidence dehors the record. The constitutional guarantee to a fair trial is not an abstract conception, but one that in its day-to-day application safeguards against the inherent shortcomings of the adversary system of criminal justice. In ensuring the reality of a fair trial to an accused the court has the responsibility of further inquiry into matters when it becomes aware that a situation of potential danger affecting the trial's fairness exists. As noted by the First Circuit in *United States v. Bosch*, 584 F.2d 1113, 1124 (1st Cir.1978): "[A]lthough a court is entitled to rely to a great extent on the parties' attorneys to protect their own

---

**6.** *Reed v. Rhodes,* 607 F.2d 714 (6th Cir.1979); *United States v. Wilson,* 631 F.2d 118 (9th Cir.

1980); *United States v. Decker,* 600 F.2d 733 (9th Cir.1979).

clients' interests, the court, too, has a duty to insure that a criminal defendant receives a fair trial."

■ In *United States v. Powe,* 591 F.2d 833, 842–843 (D.C.Cir.1979), upon passing on the issue of whether the court should raise *sua sponte* the voluntariness of a confession, the court recognized that "certain alerting circumstances may impose a duty on the trial judge to take a more active role in the trial process." And, as expressed by Justice Frankfurter: "Federal judges are not referees at prize-fights but functionaries of justice." *Johnson v. United States,* 333 U.S. 46, 54, 68 S.Ct. 391, 395, 92 L.Ed. 468 (1948). *See also: United States v. Gallagher,* No. 83–1723, 735 F.2d 641 (1st Cir.1984) at p. 643; *United States v. McCord,* 509 F.2d 334, 338 (D.C.Cir.1974), *cert. denied* 421 U.S. 930, 95 S.Ct. 1656, 44 L.Ed.2d 87. When the danger to the constitutional right to a fair trial stems from adverse publicity, that duty is even more palpable. See *Gannett Co., Inc. v. DePasquale,* 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979) and cases cited therein. In *Gannett,* the Court noted at page 378, 99 S.Ct. at 2904:

> To safeguard the due process rights of the accused, a trial judge has an affirmative constitutional duty to minimize the effects of prejudicial pretrial publicity. *Sheppard v. Maxwell,* 384 U.S. 333 [86 S.Ct. 1507, 16 L.Ed.2d 600] (1966). And because of the Constitution's pervasive concern for these due process rights, a trial judge may surely take protective measures even when they are not strictly and inescapably necessary.

And in *Nebraska Press Assoc. v. Stuart,* 427 U.S. 539, 552, 557, 96 S.Ct. 2791, 2799, 2802, 49 L.Ed.2d 683:

> [W]here there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity.
>
> [T]he measures a judge takes or fails to take to mitigate the effects of pretrial publicity ... may well determine whether the defendant receives a trial consistent with the requirements of due process.

In fact, the Supreme Court's message has been to alert trial courts to guard a criminal defendant's fundamental right to a fair trial by taking protective measures in order to avoid the more drastic remedy of reversal on appeal. *Gannett,* 443 U.S. at n. 6, page 379, 99 S.Ct. at n. 6, page 2905. In discharging this duty, we must review the media coverage surrounding the Cerro Maravilla events to determine whether any remedial measures should be taken at this time.

Since 1978 the press, radio and television coverage, heightened by the Senate public hearings, has had the cumulative effect of making Cerro Maravilla *the* media event of the years 1983–1984. The hearings, undoubtedly, aroused the excitement and the curiosity of a community that was already saturated by the earlier publicity stemming from this incident. What follows is a representative presentation of the media coverage during the period relevant to this action. It does not pretend to set forth all of the material revised by the court but it does reveal the nature of the material, the portrayals made of defendants and the expressions on their guilt or innocence which were repeatedly before the public opinion.

*Headlines and Reports*

All six newspapers carried headlines and reports such as:

"My Son was Taken There to be Killed" (*El Mundo,* 10–19–83, front page)

"Experts: Youths Died on Their Knees" (*El Mundo,* 11–18–83, front page)

(Referring to defendants Torres-Marrero and Rios-Polanco) "Two Intelligence Agents Invoke Fifth Amendment" (*El Mundo,* 11–18–83, front page)

"Agent Carmelo Cruz would Testify Rosado was Executed" (*El Vocero,* 11–22–83, front page)

"Méndez Rivera Says he saw Murder" (*El Mundo,* 10–15–83, front page)

"Rios Polanco Started the Volley of Shots: Says Marte" (*El Vocero*, 11–23–83, page 2)

"Marte Weeps Again" with photograph of Senate witness Miguel Marte crying (*El Vocero*, 11–24–83, front page)

Photo of Marte crying also appeared in (*El Reportero*, 11–23–83, front page)

"Rosado was Shot at Seven Feet" with photo of forensic and expert kneeling at the hearings (*El Vocero*, 11–18–83, page 3)

"Cruz: Pérez Casillas and Flores Forced him to Lie" (*El Vocero*, 11–29–83, front page)

"Marte: 'We Have all Gone Through Hell' " with photograph of Marte (*El Reportero*, 11–24–83, front page)

"Romero Admits Murder at Maravilla" with photograph of Rosado's blood-stained corpse (*El Reportero*, 11–23–83, front page)

"I Could Not Pass for a Judas" with photo of Senate witness Carmelo Cruz (*El Reportero*, 11–29–83, front page)

"Pérez Casillas: 'They Can't Come Down Alive.' " (*El Reportero*, 11–29–83, page 3)

"Pathologist Sustains Murder Theory" with illustration of figures kneeling while being executed (*El Reportero*, 11–18–83, front page). Also, photo of pathologist showing blood stained shirt and photo of Torres Marrero and Rios Polanco, pages 2–3.

Photo of Committee member Calero-Juarbe examining blown-up photo of bloodied face of Rosado's body. (*San Juan Star*, 10–21–83, page 3)

"Cruz Does Not Want to Take a Lie to the Grave" (*El Nuevo Dia*, 11–29–83, page 4)

"Pérez Casillas said: 'They Deserved It, They were Terrorists' " (*El Nuevo Dia*, 11–30–83, page 5)

"Murdered in Cold Blood at Maravilla" (*El Nuevo Dia*, 11–27–83, front page)

"I am Responsible for the Good and the Bad: Pérez Casillas" (*El Nuevo Dia*, 11–24–83, front page)

Report describing testimony appearing in *El Nuevo Dia* edition of November 23, 1983 states: "Rosado and Soto were riddled with bullets while kneeling; a policeman, tall and lean, kicked the body"

"Two North American Experts Affirm Soto and Rosado could have been Executed" with picture of experts holding photographs of corpses during the hearings (*El Nuevo Dia*, 11–18–83, front page)

Two close-up photos of the bloodied faces of Soto and Rosado with the following caption: "Arnaldo Dario Rosado, 28 years old, killed by shotgun blast; Carlos Soto-Arrivi, 18 years old, they saw him weep." (*El Mundo*, 11–23–83, front page)

"Montañez Confirms Planning of Murder" (*El Reportero*, 11–12–83, front page)

"Shoot Me in the Head: Soto" with early photograph of Soto in a casual stance (*El Reportero* 11–2–83, front page)

"Let Justice be Done for my Son's Sake" with photograph of widow and son of Rosado and photo of Rosado himself followed by interview with Rosado's widow (*El Reportero*, 11–7–83, page 3)

Article with photograph of defendant Quiles indicating he had stated he would not submit to a lie detector test (*El Reportero*, 10–28–83 page 2)

"Heads had to Roll" (*El Reportero*, 10–6–83, front page)

Photograph of defendant Nelson González Pérez with caption indicating he invoked the Fifth Amendment (*El Reportero*, 10–7–83, page 3)

"Grand Jury Summons Policemen" with photograph of defendant Quiles (*El Reportero*, 10–12–83, front page)

"Policemen Confronted with Conflicting Versions" (*El Reportero*, 10–14–83, front page)

"Marte Contradicts Policemen's Testimony" (*El Reportero*, 9–21–83, page 3)

"Police Version Crumbles" with photo of defendant Mateo Espada and witness Cartagena-Flores at Senate hearing testifying side by side, following Committee's practice of confronting witnesses simultaneously, and subtitle at page 2 indicating: "Con-

tradictions of Policemen Pour" (*El Reportero*, 9–29–83, front page)

"Prober: Cerro Notes Destroyed" (*San Juan Star*, 6–23–83, front page)

"Ex-cop Cites Bribe Offer at Cerro Hearing" (*San Juan Star*, 6–16–83, front page)

"Bruno Denies Killing Rosado" with photo of defendant Bruno with shotgun during the hearing (*El Mundo*, 9–14–83)

"Policeman Admits Killing Soto-Arrivi" with photo of defendant R. Torres Marrero (*El Mundo*, 9–8–83, front page)

Article indicating policemen gave testimony which differed from previous declarations of Cerro Maravilla, with photo of defendant Mateo-Espada (*El Mundo*, 9–29–83, front page)

"TV Technician Contradicts Policemen" (*El Nuevo Dia*, 9–21–83, front page)

"Notable Discrepancies Between Two Policemen" with photo of defendant Mateo-Espada and Senate witness Cartagena-Flores (*El Nuevo Dia*, 9–29–83, front page). Other articles covering said testimony indicated that in the middle of the confrontation between Cartagena and Mateo-Espada, the Senate Investigator asked the witnesses' common counsel to indicate which of the two witnesses he would represent given what the Investigator deemed contradictory testimony between the witnesses. The attorney chose Cartagena and the hearing was continued. (*El Reportero*, 9–29–83, page 2)

"Sergeant's Memory Lapses" with photo of defendant Mateo-Espada (*El Nuevo Dia*, 9–30–83, front page)

"Marte Passes Lie Detector Test" with subtitle "Marte Tells Truth According to FBI Tests" (*El Nuevo Dia*, 9–27–83, front page and page 4)

"Marte Requests Immunity in Midst of Testimony During Hearing in Order to Tell the Truth" (*El Nuevo Dia*, 9–22–83)

"Perjury was Committed" with photos of defendants Bruno, Colón, and Moreno (*Claridad*, 9–22–83, page 3)

"Rios Polanco Murdered My Son" Article about mother referring to a 1976 unrelated incident (*Claridad*, 9–29–83)

Pérez Casillas Takes Blame" (*El Mundo*, 11–24–83, page 12–B)

"RHC Sees Shadow of Fascism" (*El Mundo*, 11–25–83, page 5–A) referring to ex-governor Rafael Hernández-Colón

"Witnesses: Youths were Executed" (*El Mundo*, 11–23–83, front page)

"Carmelo Cruz: Casillas and Quiles Ordered Testimonies be Falsified" (*El Mundo*, 11–29–83, front page)

Referring to declaration of Mayor Padilla, headline reads: "Indicates Murders at Maravilla Have Been Proven" (*El Mundo*, 11–29–83, page 14–A)

Referring to testimony of Senate witness Montañez-Ortiz, headline reads: "Alleges Pérez-Casillas Ordered to Shoot" (*El Mundo*, 12–1–83, front page)

"Cerro Cop Now Admits Firing His Revolver" (*San Juan Star*, 9–15–83, page 3)

"Mother Weeps for Son Slain in Maravilla" (*San Juan Star*, 10–19–83, page 21)

"Two Experts Tell Panel Cerro Victims Shot While They Kneeled" (*San Juan Star*, 11–18–83, front page)

"Marte: 'Threats Kept Truth Hidden'" (*San Juan Star*, 11–23–83, page 1)

"Marte Says Officials Told Him to Lie" (*San Juan Star*, 11–24–83, page 1)

"Pérez Casillas Accepts Cerro Responsibility" (*San Juan Star*, 11–24–83, page 3)

"Cerro Cover-up Unsealed" (*San Juan Star*, 11–28–83, page 1) last of series of five articles on Cerro Maravilla events

"Cartagena: 'Both Killed by Firing Squad'" (*San Juan Star*, 11–30–83, front page)

"Police Perjury May be Exposed as Case Resumes" (*San Juan Star*, 11–2–83, page 3)

"Montañez Opts for Witness Chair over Jail Cell" (*San Juan Star*, 11–4–83, page 2)

"Crowd Eats, Drinks and Hangs Around Sundays at Cerro" (*El Mundo*, 10–11–83, front page) Article relates week-end activi-

ties at the site, refers to it as "new sanctuary." Photographs of persons wearing T-shirts printed with phrase made popular by the Senate investigator during questioning of witnesses at hearings: "State if it is true or not"

Article on investigator Rivera Cruz carrying headline: "Rivera Cruz: The Price of Fame" (*El Mundo*, 12–12–83, page 5–A)

"De Jesús Refuses to Represent Cerro Cop" followed by article that Roberto De Jesús-Cintrón, court-appointed counsel for codefendant Reverón-Martinez, refused to represent him because he believed all ten Cerro Maravilla defendants were guilty on all counts. He is quoted as saying: "As repugnant as murder is, this case goes beyond murder. It represents an assault upon democracy itself, an attempt to transplant to Puerto Rico the tactics of Papa Doc in Haiti." (*San Juan Star*, February 1984)

Similar article with headline "H. Rivera Cruz—no Longer an Unknown Face" (*San Juan Star*, 7–4–83, page 3)

"Hearings Rate High with TV Audience at Sears" (*San Juan Star*, 9–8–83, page 3)

"Senate Cerro Hearings Fascinate the 'Regulars'" with photos of public at Senate hearings (*San Juan Star*, 10–13–83, page 3). Article reports about some fifteen (15) persons who attended the hearings on a regular basis, bringing coffee and sandwiches for themselves and others.

"Scores flood to Maravilla for First Hand Look" (*San Juan Star*, 10–17–83, page 2)

"Maravilla Hearings Outrank Soaps in TV Survey" (*San Juan Star*, 11–6–83, page 43, Portfolio)

Photograph of wood carved statuettes by Puerto Rican "santeros," depicting judiciary committee members (*San Juan Star*, 11–17–83, page 22). Caption indicated that statuettes could be obtained at popular shopping center

Photo: Rivera Cruz pointing to birthday cake in the form of Cerro Maravilla site (*San Juan Star*, 11–10–83, page 2)

"Officer's Cerro Testimony has Gaping Holes" (*San Juan Star*, 9–18–83, page 2)

"The Lingering Doubt: How Far Up Did the Coverup Go" (*San Juan Star*, 11–25–83, page 2)

"The Grand Jury Visits the Cerro Maravilla" (*El Mundo*, 7–23–84, front page) there is a photo of a group of people before a communications tower with caption: "members of the Federal Grand Jury which intervened in charges against policemen who participated in the Cerro Maravilla incident yesterday visited said mountaintop in Villalba." The article states that: "a group of the twenty-three jurors who made up the panel, with relatives and friends, made a visit to Cerro Maravilla to familiarize themselves with the place where agents of the intelligence division of the Police finished off Arnaldo Dario Rosado and Carlos Soto-Arrivi after they were arrested on July 25, 1978."

The Cerro Maravilla incident generated a considerable amount of editorial comment and newspaper columns whereby the credibility of the defendants was constantly attacked. They were also the object of scorn and mockery [7] and belief in their guilt was repeatedly expressed or taken for granted. In its reporting or in feature stories, the press often made inferences or outright statements on the guilt of defendants. The following are illustrative of these:

---

**7.** During codefendant Nelson González-Pérez' testimony before the Senate Committee, a fly apparently found its way to the witness stand and was picked up by the TV cameras while it rested on the witness. This incident made its way to the headlines and was even the subject of an editorial (Investigate that Fly! *El Mundo*, 11–15–83). An innuendo on the fly's presence was made notorious in a distasteful illustration which occupied the entire front page of the *El Reportero* edition of October 14, 1983. In it, the illustrator decided to explain the reason for the fly's presence by showing González-Pérez testifying at the hearings next to a roll of toilet paper while a swarm of flies hovered over him. Nuances in defendants' testimonies at the hearings, such as whether a particular type of food was eaten, were also ridiculed by satirical columns.

1. "The Great Lie," by Manuel Méndez Saavedra referring to Pérez Casillas' testimony. (*El Mundo*, 2–11–83, page 19–a)

2. "Three Similar Cases," by Jorge Javariz, (*El Mundo*, 10–6–83, page 15–A) compares Cerro Maravilla events with Watergate and Chappaquiddick

3. "Lying to Cover-Up," by Jorge Javariz (*El Mundo*, 10–7–83, page 11–A)

4. "The Minority," by Jorge Javariz (*El Mundo*, 11–22–83, page 13–A) stating: "Everyone now knows the terrible, monstrous truth which for five years has remained hidden in the brushes at the Cerro. This truth could explain the minority's behavior."

5. "From Maravilla to Fortaleza," by Antonio J. González (*El Mundo*, 11–28–83, page 19–A): "The most horrendous, senseless murder by police in our history." Columnist also refers to the "execution by firing squad of the young independence advocates" and that "all lied shamelessly and cynically."

6. "The Devil's Advocate," by Manuel Méndez Saavedra (*El Mundo*, 11–29–83): "The senators and NPP leaders who obstructed the investigation, turning themselves into accomplices of the lie, are as guilty as those who committed the crime."

7. "A New Tactic," (*San Juan Star*, editorial 10–10–83, page 29) on tactics of Senate hearings witnesses to evade answering

8. "More Stonewalling," (*San Juan Star*, editorial 10–19–83, page 39) criticizing what it conceives as dilatory tactics

9. "The other Maravilla Theory," by Juan M. Garcia Passalacqua (*San Juan Star*, 10–26–83 page 41) advancing the theory that Soto was killed on the way to the hospital.

10. "Police Power, Police Force, and the Police State," by José Arsenio Torres (*San Juan Star*, 11–26–83, page 18)

11. "Maravilla Lessons," by B.F. Cerezo (*El Mundo*, 11–27–83, page 19–A): "Not only were they murdered by the police, but from that moment onward the police devot-

ed itself to sustain the necessary lies to cover up their fellow policemen."

12. "The Maravilla Lesson," by Frank Ramos (*San Juan Star*, 11–30–83, page 37): Cerro Maravilla is Puerto Rico's Watergate

13. "Maravilla, Coverup," by Antonio J. González (*El Mundo*, 10–17–83, page 13–A): "Nobody believes any longer the so-called 'official version' that the deaths of the young 'independentistas' was an act of self-defense ... the contradictory declarations of the members of the police on who was or was not at Cerro Maravilla and now, the outright incredible statement of the ex-sergeant, now lieutenant Nelson González, must necessarily create in the people's mind, the idea that there exists on the government's part a complete official operation to lie and cover-up what really happened at Cerro Maravilla."

14. "What Happened at Maravilla," by M. Méndez Saavedra (*El Mundo*, 10–18–83 page 11–A) Columnist wonders: "How an intelligent man like Captain Jaime Quiles puts all his prestige and professional career on the line, trying to justify the unjustifiable and pretending to accept such unrealistic explanations which he has given before the Senate."

15. "Queries," by Jorge Javariz (*El Mundo*, 11–2–83 page 19–A) on how after the policemen's testimony nobody can question that terrorist acts are encouraged by the police.

16. "The Plan was to Kill Them," by Antonio J. González (*El Mundo*, 12–5–83 page 9–A) refers to the policemen involved at Cerro Maravilla as a "pack of alienated sadists," states that "these were the same who, with a cynical smile, lied cynically to cover up their misdeeds."

17. "Monstrous Execution" (*El Vocero*) editorial 11–24–83 page 19)

18. "Many Reasons to Give Thanks," by Celeste Benitez (*El Reportero*, 11–24–83 page 12): "It is finally known that Soto and Rosado were murdered."

19. "The Truth at Last," (*El Reportero*, 11–23–83 page 14) indicating that there can be no doubt now as to what really hap-

pened at Cerro Maravilla: "The verdict has been reached."

20. Column by House Speaker Severo Colberg which compares the Maravilla incident to the Ponce massacre (*El Reportero*, 11–26–83 page 12)

21. Editorial in *El Reportero* of 10–11–83 page 11 portraying the attorneys for the policemen who testified at the Senate hearing as interested in political favors or money.

22. "Officers' Cerro Testimony has Gaping Holes," News analysis by M. Suárez (*San Juan Star*, 9–18–83 page 2) commenting that officers had been caught in numerous contradictions, but were firm that 'independentistas' fired first. Analyst concludes that "their account flies in the face of logic." After stating police version, news analyst states: "Here is where the police story runs into trouble."

23. "Cerro probe digs deep," News analysis by M. Suárez (*San Juan Star*, 7–11–83 front page) where he indicates that, at the end of the first stage of the hearings, the most charitable conclusion would be that previous investigations were incompetent and, the worst, that both were deliberate attempts that involved falsifying records, destruction of documents and intimidation of witnesses, to cover up the murders of Soto Arrivi and Rosado.

24. News analysis by M. Suárez, *San Juan Star*, October 14, 1983, where it is indicated that the two-volley testimony leads to two conclusions: that the independentistas were slightly wounded and were then finished off or that they were killed by the first volley and then their guns fired by the police to make it appear as if the independentistas had fired first.

The reporting of the news, frequently off-course in the objective presentation of the facts, contained conclusory, slanted commentaries and subjective opinions of the reporters. The reporting of the testimony of the policemen at the hearings was constantly characterized as contradictory, altered, or belied by other testimony. For example, commenting on defendant Nelson González' taking the Fifth Amendment the newspaper *El Reportero* informed that it had consulted an attorney who stated that the denial to testify on the basis of the Fifth Amendment could be interpreted as an admission of guilt. Another recent example of this is a report in the August 16, 1984 edition of the *San Juan Star*, on a totally unrelated incident involving TV technician Miguel A. Marte, which ends as follows:

Marte, an employee of the Puerto Rico Electric Power Authority, was working on a second part-time job at the WRIK–TV transmitter at Cerro Maravilla July 25, 1978, the day police killed independence advocates Carlos Enrique Soto and Arnaldo Dario Rosado.

Though he initially supported the official government account that police killed the "independentistas" in self-defense, Marte's dramatic about-face at a Senate televised hearing last year *blew the lid off the Cerro Maravilla coverup*. (Emphasis ours.)

The community has also been constantly exposed to remarks by respected public figures of the entire political spectrum and by members of the Senate Judiciary Committee proclaiming belief in defendants' guilt or expressing doubts on the veracity of their testimonies which appeared in newspapers, television and radio coverage:

Miguel Giménez-Muñoz, Secretary of Justice during the initial Cerro Maravilla investigation, commented on the new version given by the witnesses who were granted immunity: "it reveals that the police agents lied to the Department of Justice investigators" and that the "murder" of the independentistas is "unpardonable." (*El Mundo*, 12–14–83 page 8–A)

Rafael Hernández-Colón, Ex-Governor and gubernatorial candidate: "Maravilla casts its long and dark shadow over Puerto Rico because it is the shadow of fascism in its most extreme manifestation: the summary execution of dissidents and the official lie to hide this from the people."

Remarks attributed to Juan Mari-Bras, political leader, appeared in *El Mundo*, 10–

10–83, page 3–A, in the sense that neither Carlos Soto-Arrivi nor Arnaldo Dario Rosado enjoyed a democracy when they were executed Pinochet-style.

Hernán Padilla, Mayor of San Juan and gubernatorial candidate, indicated that murders at Cerro Maravilla have been proven. (*El Mundo*, 11–29–83, page 14–A)

Francisco Coll-Moya, former law school dean Ártícle entitled "Ex-dean: 'Cerro case contains criminal acts,'" reported the following remarks by the former dean before a joint session of legislative committees: "The case involves first degree murder, second degree murder, entrapment, destruction of evidence and obstruction of justice."

José R. Lebrón-Velázquez, head of Puerto Rican Evangelical Council, urged purge of Cerro offenders (*San Juan Star*, 11–24–83, page 2)

Hernán Padilla: "Nobody who is certain of what he says needs to invoke the Fifth Amendment." (*El Mundo*, 10–14–83, page 6–A)

Fernando Martin, gubernatorial candidate for the Puerto Rico Independence Party, referring to possible F.B.I. involvement at the Maravilla incident: "It would be gross ingenuity not to use these Senate Hearings to explore this angle so critical to the Cerro Maravilla murders." (*El Mundo*, 10–15–83, page 5–A)

Carlos Gallisá, leader of the Puerto Rico Socialist Party, declared that Maravilla was a political murder. (*El Mundo*, 10–25–83, page 5–A)

Oreste Ramos, Senator for the New Progressive Party and member of the Senate investigating committee indicated that his fellow committee members were convinced that murder was committed at Cerro Maravilla, (*El Mundo*, 12–5–83, page 10–A) and (in *El Nuevo Dia*, 11–27–83, front page) asked for the immediate expulsion of Pérez-Casillas from the Police force.

Héctor Rivera-Cruz, Special Investigator for the Senate Judiciary Committee investigating Maravilla:

*El Mundo*, 12–12–83, page 5–A: Article indicated that the investigator had pointed out that what occurred at the Cerro Maravilla were cold-blooded murders and that the police had criminal responsibility.

*El Mundo*, 12–2–83, page 9–A: "Today, at the end of the second stage of this investigation, it has been proven that illegal deaths were committed, that the youths were murdered in an inhumane manner ... the evidence presented establishes guilt beyond a reasonable doubt."

*El Mundo*, 12–3–83, page 5–A: Speaking to school children who visited the Legislature, he remarked that the hearings brought fourth "God's truth" and that God was behind his work. Comparison was also made to a biblical passage and key witnesses' "true" testimony after being granted immunity.

Calixto Calero-Juarbe, member of the Senate Judiciary Committee, described the "killing" and the cover-up as "monstrous acts," stated that there was sufficient evidence to charge the policemen with murder, identified defendants Rafael Torres-Marrero and Luis Reverón as the ones who killed Soto and Rosado according to the testimony of agents Cruz and Cartagenà-Flores and singled Pérez-Casillas as the one responsible. (*San Juan Star*, 11–24–83, front page)

Francisco Aponte-Pérez, President of the Senate Judiciary Committee:

*El Mundo*, 11–28–83, page 3–A reported a Radio interview with Senator Aponte-Pérez in which he was quoted as having expressed that Pérez-Casillas should leave the Police, that he had no doubts that confronted with the possibility of incarceration he would talk and tell the truth about those who planned what happened. Aponte-Pérez was quoted as stating that Pérez-Casillas lacked "the philosophical depth to plan an act of murder such as Maravilla."

*El Mundo*, 10–25–83, front page: Referred to comments of Senator Aponte-Pérez on the existence of a plan to blame

policemen and sacrifice them for Romero.

*El Mundo*, 10–22–83, page 8–B: "The Police force is everyone's pride, and at a time in which its dignity is tainted by the improper actions of a limited number of officers in disobedience of the law and in disrespect to elective representatives ... some who fail to speak the truth."

José Granados-Navedo, New Progressive Party legislator, was reported as having stated, regarding the last declarations of the Senate witnesses who received immunity, that these "cause repugnance to any person having firm democratic beliefs and with a humanitarian feeling" and referred to acts allegedly committed by a "handful of policemen," as "crimes that defy imagination." (*El Mundo*, 11–24–83, page 12–B)

Miguel Hernández-Agosto, President of the Senate of Puerto Rico and member of the Judiciary Committee:

Commenting on the proof of ballistic expert to be presented, he was reported as having said that it would prove that Soto and Rosado died trying to take cover. Commenting on the cost of the hearings, he indicated that the Romero administration had spent millions in concealing the truth. He characterized witness Méndez-Rivera as a "pathological liar." (*El Mundo*, 11–14–83, front page and 17–A)

*El Mundo*, 11–12–83, page 6–A, at a showing of the film "Watergate, Ten Years After" was quoted as having said that the Senate "did not pull the trigger, did not cover-up the process and is not responsible for what happened there."

*El Mundo*, 11–9–83, page 18–A, again commenting on the testimony of witness Méndez-Rivera he is reported as having said that the expression "I don't remember" repeated by the witness is tantamount to lying and that the witness had insulted the inteligence of the people.

*El Mundo*, 11–18–83, front page: "Each time the people can better detect who is telling the truth and who is lying." Commenting on the Fifth Amendment privilege invoked by defendant Torres-Marrero and Rios-Polanco, the news article indicated that he stated: "By resorting to such refuge, what they are implying is that if they repeat the testimony that they previously offered to another Grand Jury and the one offered in the civil action for their participation in the Cerro Maravilla incident, they would be exposing themselves to perjury charges." Referring to possible grants of immunity to other policemen he was quoted as having said: "We will not grant immunity to one who pulled the trigger and who was responsible for those deaths."

*El Mundo*, 11–20–83, front page, he was reported as having said that the expert ballistic evidence presented at the hearings destroyed the official version of the facts.

*El Mundo*, 11–23–83, page 3–A, under the headline "MHA demands press be present at meeting with CRB," Senate President was reported as having criticized the Governor at a press conference, asking: "Whether he is with the policemen who lied or with those who told the truth on Monday."

*San Juan Star*, 10–7–83, page 16, reported comments of Senator Hernández-Agosto on changes in legal representation as: "Lawyers said picked to keep cover-up safe."

The subject of most of this news reporting, the Senate televised hearings themselves, enthralled the public and made the Cerro Maravilla incident a conversation piece and a household word. These hearings were not the usual type of legislative investigation. As they developed, defendants, in effect, stood trial before an entire community and guilt was adjudicated without the constitutional protections afforded a criminal defendant in a court of law and without the safeguards of evidentiary principles. Although we are aware that such safeguards are not applicable in non-adversary legislative hearings yet, with all due respect to the Senate's exercise of its legitimate investigative function, the Maravilla hearings were conducted in an adversative atmosphere which, nonetheless, lacked the balance and the impartiality of a judicial

process where an accused enjoys a presumption of innocence, is entitled to confront and cross-examine witnesses, compel the attendance of witnesses to testify in his favor, an active and effective assistance of counsel and the right to remain silent. These televised hearings ended in a dramatic note after the Senate announced that several policemen present at the Cerro site had been granted immunity and would offer revealing testimony. Before an expectant community, these witnesses revealed, in a testimony filled with emotional overtones, that Soto and Rosado were summarily executed. Their testimonies triggered a massive public reaction reflected in the media. From that moment onward, charges of murder against defendants were constantly voiced and exposed by the media. The Senate investigation moved on to what the press termed the cover-up stage, taking for granted the guilt of defendants as expressed by the last witnesses at the hearing.

To this date, the Cerro Maravilla issue remains in the limelight because of constant media exposure.[8] This is due in part to the ongoing Senate investigation and the fact that Cerro Maravilla is a major issue in the upcoming elections. Recent political propaganda as pointed out by one of the codefendants, includes a television commercial which shows the corpses of Soto and Rosado with the word "cover-up" superimposed in red ink.

It is illusory to think that this type of publicity is going to wear off as the election day approaches, which is but seventy-six (76) days away.[9] The government concedes as much, yet argues against a continuance stating that these are not favored in highly publicized cases. The case cited in support of this, *Groppi v. Wisconsin*, 400 U.S. 505, 91 S.Ct. 490, 27 L.Ed.2d 571 (1971), expressly recognizes continuances as one of several ways of dealing with prejudicial publicity. In that case continuance was just not an effective protection because the situation was one of *repeated* continuances. It does not stand for the general proscription of continuances in publicized cases as the government would have us believe. The government's position before the adverse publicity phenomena present in this case is simply to do nothing other than hold the trial in the midst of it because, at present, it cannot be overcome. The only remedial measure that the prosecution seems to recognize is a change of venue. However, it discards this method for it was not requested by defendants. "The right to apply for a change of venue [however] is given for defendant's benefit and at his option [and] [h]e is not obliged to forego his constitutional right to an impartial trial in the district wherein the offense is alleged to have been committed." *Delaney v. United States*, 199 F.2d 107, 116 (1st Cir.1952). Finally, the government has also raised the possibility of tampering of witnesses and fading of memories by the passage of time. It has not brought forth any evidence whatsoever to sustain a charge of tampering. As to the recollection of witnesses, there is no reason to believe that the witnesses' memories will be bright six years after the events and dimmer six years and six months thereafter.

These minor arguments should not deviate our attention from the central consideration before us at this moment: can defendants receive a fair and impartial trial in this District in September 1984 or immediately thereafter? The Court is satisfied that they cannot.

■ In order for prejudicial pretrial publicity to require taking any of the protec-

8. Just recently, *Life Magazine* gave the Cerro Maravilla incident national exposure by publishing an article with photographs of dramatized reenactments of both the original police version of self-defense and the summary execution version given by the policemen who received immunity. On August 20, 1984, *El Mundo* published an article on the *Life* coverage of Cerro Maravilla and reprinted a *Life* photograph of one of the reenactments. The *Life* photograph chosen that appeared in *El Mundo's* front page was the one reenacting the execution version.

9. Since there are matters pending disposition, this case would most probably be ready for trial very close to election day.

tive measures to guarantee a fair trial, "the publicity must be proximate in time to the trial, the accused must be the focus of the publicity and the publicity must be sensational in nature." *United States v. Kelly,* 722 F.2d 873, 879–880 (1st Cir.1983). All of these factors are present in this case. As stated, the factor of the electoral propaganda and the continuous nature of the Judiciary Committee investigation have kept and will continue to keep the Cerro Maravilla incident before the public opinion at least during the coming months.

These defendants were tried before the Senate, they were tried by the media and, lest it be forgotten, they await trial before this Court. This criminal trial shall not be a mere formality. These defendants' right to a fair and a decent trial shall be protected in the same manner that the criminal adversary system respects and protects the rights of any accused. It is surprising that the government should assume a legalistic approach based on technical notions of judicial notice to deny a reality that strikes one in the face. The credibility factor looms large in this case. When the credibility of defendants is trampled upon, and that of adverse witnesses is publicly enhanced by influences and events occurring prior to trial and outside the courtroom, you face diverse situations of danger, not the least of which could be that defendants be compelled, if not adequately protected, to forego their constitutional right to remain silent in order to rehabilitate their images as perjurors and conspirators imprinted in the public opinion by the massive build-up of publicity.

Unpopular as this decision may be to some, the court will not yield to public pressure and proceed now to defendants' trial despite the injustice of doing so. Sixty years ago in Chicago's Cook County Court an attorney [10] struggled with the public clamor demanding the death penalty for Nathan Leopold and Richard Loeb. He asked then why they should die. His answer is still good today:

Because the people are talking about it. Nothing else. It would mean, Your Honor, that your reason was convinced. It would mean in this land of ours, where talk is cheap, where newspapers are plenty, where the most immature expresses his opinion, and the more immature the stronger, that a court couldn't help feeling the great pressure of the public opinion which they say exists in this case.

Let all those who share the responsibility of participating in this criminal process— Court personnel, prosecutors, defense attorneys, law enforcement officers, media representatives and society as a whole—be mindful of the thoughts expressed by Justice Frankfurter:

More than one student of society has expressed the view that not the least significant test of the quality of a civilization is its treatment of those charged with crime, particularly with offenses which arose the passions of a community. One of the rightful boasts of Western civilization is that the State has the burden of establishing guilt solely on the basis of evidence produced in court and under circumstances assuring an accused all the safeguards of a fair procedure. These rudimentary conditions for determining guilt are inevitably wanting if the jury which is to sit in judgment on a fellow human being comes to its task with its mind ineradicably poisoned against him. How can fallible men and women reach a disinterested verdict based exclusively on what they heard in court when, before they entered the jury box, their minds were saturated by press and radio for months preceding by matter designed to establish the guilt of the accused. A conviction so secured obviously constitutes a denial of due process of law in its most rudimentary conception.

*Irvin v. Dowd,* 366 U.S. 717, 729, 81 S.Ct. 1639, 1646, 6 L.Ed.2d 751 (1961) (concurring opinion)

---

**10.** Clarence Darrow's summation which began on August 22, 1924 in the case of the *State of*

*Illinois v. Nathan Leopold, Jr. and Richard Loeb* before the Criminal Court of Cook County.

Having considered the totality of the circumstances and conditions now present, the Court finds that intensive and harmful pretrial publicity impedes holding the trial of this case at least until early 1985. For the reasons stated in this order, the Court finds that the ends of justice served by the granting of a continuance outweigh the best interests of the public and the defendants in a speedy trial. Accordingly, a continuance is GRANTED until February 1985. A specific trial date shall be set during such month and year in a separate order.

SO ORDERED.