Carlos Romero BARCELO, Plaintiff,

v.

Miguel Hernandez AGOSTO, his wife Maria Casanova, and the conjugal partnership constituted between them, Marco Antonio Rigau, his wife Maria Del Carmen Moran, and the conjugal partnership constituted between them, Edgardo Perez Viera, his wife Carmen L. Marrero, and the conjugal partnership consti-

tuted between them, and Popular Democratic Party, and John Does one through one hundred, Defendants.

Civ. No. 92–2358(JP).

United States District Court,
D. Puerto Rico.

Jan. 25, 1995.

Michael Rovell, Chicago, IL, Carlos Látimer, San Juan, PR, for plaintiff.

Marcos Ramírez Lavandero, Old San Juan, PR, Roberto Fernández, Goldman, Antonetti & Córdova, San Juan, PR, for defendants.

## OPINION & ORDER

PIERAS, District Judge.

The Court has before it defendants' motion to dismiss the complaint (docket No. 2), plaintiff's opposition (docket No. 6), and defendants' reply (docket No. 12). The plaintiff, Carlos Romero Barceló, initiated this action to recover damages for alleged violations to his civil rights as well as for damages to his honor and reputation. The defendants, Miguel Hernández Agosto, Marco Antonio Rigau, Edgardo Pérez Viera, and their respective spouses and conjugal partnerships, deny any wrongdoing and claim that they are completely immune to all claims presented by the plaintiff pursuant to the protections afforded by the doctrine of legislative immunity. For the reasons set forth below, the motion to dismiss is hereby **GRANTED**.

## I. Background

The facts which give rise to plaintiff's complaint are tantamount to a lesson on the modern political history of Puerto Rico. The plaintiff, Carlos Romero Barceló, has been one of the dominant figures in Puerto Rican politics for over two decades. He was affiliated with the Statehood Republican Party ("SRP") and has been a member of the SRP's successor, the New Progressive Party ("NPP"), since its creation in the late 1960s. The NPP, which is one of the two principal political parties in Puerto Rico, advocates statehood for Puerto Rico. The plaintiff currently holds the position of Resident Commissioner for Puerto Rico, through which he represents the Commonwealth of Puerto Rico as a member of the United States Congress. Prior to holding this position, he served as Mayor of San Juan (1969–77), Governor of Puerto Rico (1977–85), and Senator in the Puerto Rico Legislature (1987–89).

In the summer of 1978, while the plaintiff was serving his first term as Governor, two young supporters of a radical nationalist pro-independence group were killed in a shooting incident with police officers at a mountain locale known as Cerro Maravilla. The police reported that the two men were killed while resisting arrest. However, the incident took on considerable political importance and was the subject of intense media coverage as evidence surfaced suggesting that Arnaldo Darío Rosado and Carlos Soto Arriví were murdered after they surrendered to the police. This incident also gave rise to a host of legal actions, both in federal court and in the courts of Puerto Rico.[1] A brief review is in order.

---

1. *See, e.g., Colón Berríos v. Hernández Agosto,* 716 F.2d 85 (1st Cir.1983) (civil rights action seeking to enjoin the Senate Judiciary Committee from compelling witnesses to appear and from publishing documents barred by doctrine of legislative immunity); *In re San Juan Star,* 662 F.2d

On February 6, 1984, a federal grand jury for the District of Puerto Rico returned a forty-four (44) count indictment against nine (9) members of the Intelligence Department of the Puerto Rico Police for a conspiracy to: (1) obstruct justice in a criminal investigation, (2) give false testimony in depositions and before federal grand juries, and (3) suborn perjury. *United States v. Moreno Morales*, 815 F.2d 725, 730 (1st Cir.1987). . In essence, the indictment charged the defendants with engaging in a conspiracy to " 'prevent the citizens of Puerto Rico and law enforcement authorities of Puerto Rico and the United States from learning that Arnaldo Darío Rosado and Carlos Soto Arriví had been unlawfully brutalized and killed by officers of the Police of Puerto Rico.' " *Id.* (quoting from the indictment). All defendants were police officers present during the Cerro Maravilla incident. On March 28, 1985, a jury found the defendants guilty on thirty-six (36) of the forty-four (44) counts. With the exception of Colón Berríos' conviction, which was reversed on appeal, *see Moreno Morales*, 815 F.2d at 752, all convictions were upheld. The defendants received different sentences, which ranged from six to thirty years.[2]

The desire to keep the events that transpired at Cerro Maravilla secret was not limited to police officers. On October 10, 1986, an Independent Special Prosecutor filed disciplinary charges in the Puerto Rico Supreme Court for ethics violations against five different state prosecutors that participated in the initial Cerro Maravilla investigation. The complaint named the following state prosecutors: Pedro Colton Fontán, Osvaldo Villanueva Díaz, Aurelio Miró Carrión, Angel Figueroa Vivas, and Juan E. Brunet Justiniano. The Independent Special Prosecutor charged these attorneys with improper professional conduct during the investigations of the events leading to the death of Arnaldo Darío Rosado and Carlos Soto Arriví. Specifically, these attorneys were accused of hindering their own investigations and ignoring evidence supporting the proposition that Darío Rosado and Soto Arriví had been murdered. After due consideration by the Puerto Rico Supreme Court, the attorneys received severe disciplinary sanctions as the Court found that they had violated various ethical obligations during their investigation of the Cerro Maravilla murders by willfully ignoring available evidence.[3] *See, In re Pedro Colton*, 91 J.T.S. 24 (1991).[4]

Finally, and most importantly, on January 18, 1985, various police officers present at Cerro Maravilla at the time of the incident— Angel Luis Pérez Casillas, Rafael Moreno Morales, Nelson González Cruz, Juan Bruno González, Nazario Mateo Espada, Jaime Quiles Hernández, William Colón Martínez, and Rafael Torres Marrero—were charged, among other counts, with first degree murder for the deaths of Arnaldo Darío Rosado and Carlos Soto Arriví. Shortly thereafter, Nelson González Cruz, Juan Bruno González, Nazario Mateo Espada, Jaime Quiles Hernández, and Rafael Torres Marrero, pled guilty to second degree murder and perjury charges. William Colón Martínez pled guilty to conspiracy to commit murder and two (2) counts of perjury. The other two defendants went to trial. On March 18, 1988, a jury found Angel Luis Pérez Casillas innocent of all charges, and Rafael Moreno Morales

108 (1st Cir.1981) (order prohibiting disclosure to the press of deposition contents in civil rights action did not abridge First Amendment rights of newspaper company); *United States v. Pérez Casillas*, 593 F.Supp. 794 (1984), *later proceeding*, 607 F.Supp. 88 (1985) (criminal suit charging police officers with perjury and conspiracy to conceal conduct constituting brutality); *Romero Barceló v. Hernández Agosto*, 15 T.P.R. 487 (1984) (action seeking to enjoin the Senate Judiciary Committee from using public funds to televise hearings barred by legislative immunity).

2. The defendants were sentenced as follows: Pérez Casillas, 20 years; Moreno Morales, 30 years; Torres Marrero, 20 years; Quiles Hernández, 12 years; González Pérez, 24 years; Bruno González, 16 years; Mateo Espada, 6 years; and Ríos Polanco, 10 years.

3. The Puerto Rico Supreme Court imposed the following disciplinary sanctions: Pedro Colton Fontán, disbarred; Angel Figueroa Vivas, disbarred; Osvaldo Villanueva Díaz, indefinite suspension; Aurelio Miró Carrión, five (5) year suspension; Juan E. Brunet Justiniano, three (3) year suspension.

4. The official English translation is not yet available.

guilty of second degree murder as to the death of Carlos Soto Arriví. *See, Puerto Rico v. Pérez Casillas,* 92 J.T.S. 171 (1992).[5] The Court sentenced Rafael Moreno Morales to a prison term of twenty-two (22) to thirty (30) years pursuant to local law. *Id.* After Moreno Morales' sentence was affirmed on appeal, *see Id.,* the last chapter of this dark and sad saga was finally over.

As these cases demonstrate, Carlos Soto Arriví and Arnaldo Darío Rosado were ambushed and murdered by Puerto Rico police officers. To protect themselves, the police officers involved created a conspiracy to hide the truth surrounding the murders. Furthermore, state prosecutors wilfully ignored available evidence during their investigations which, at the very least, suggested that police officers murdered Darío Rosado and Soto Arriví. These actions by the state prosecutors allowed the police officers involved to initially succeed in their conspiracy to hide the truth. The hearings on the Cerro Maravilla incident held by the Judiciary Committee of the Puerto Rico Senate ("the Committee"), which serve as the framework upon which the complaint is based in this case, were undoubtedly the catalyst force that unmasked the truth about the murders. A brief overview of the Committee hearings is also in order.

From 1976 through 1980, the NPP, presided by the plaintiff, enjoyed a majority in the Puerto Rico Senate. Control of the Senate then passed from 1981 through 1992 to the Popular Democratic Party ("PDP"), which advocates continued commonwealth status for Puerto Rico. In 1983, the Committee, under authorization provided by Puerto Rico Senate Resolution 91 of February 22, 1981, initiated public hearings into the events surrounding the shootings at Cerro Maravilla. The first phase of the hearings was conducted under the chairmanship of the respected and astute Senator Francisco Aponte Pérez, assisted by Investigator Héctor Rivera Cruz. After a short recess, the Committee reactivated the hearings, just prior to the elections of 1984. Defendant Marco Antonio Rigau assumed control of the Committee as its chairman on 1988, while its investigative ef-

forts were conducted under the direction of defendant Edgardo Pérez Viera. After a dormant period which lasted from about 1986 to 1991, the hearings were renewed for a third time in October 1991, under the direction of Rigau and Pérez Viera. Complaint ¶¶ 16–19.

The essence of plaintiff's allegations in this case is that the Committee hearings were devised by the defendants—who are members of the PDP—"for the purpose of destroying [the plaintiff's] association with the NPP, his political credibility, his right to associate with a political party, his right to aspire for a political career and run for office, and his right to disassociate himself from unpopular views." *Id.* ¶ 13. In particular, the plaintiff alleges that the members of the Committee "slanted and manipulated the testimony and facts" presented during the hearings to suggest that he was involved in the planning and shooting of the two youths and in subsequent efforts to cover up the event. *Id.* ¶ 21.

The plaintiff alleges that the defendants used the public hearings to mount political attacks against him; that the hearings were initiated in October 1984 to interfere with his effort to be re-elected as Governor in November 1984; that they were reactivated in October 1991 to influence a referendum sponsored by the PDP scheduled for December 1991 which implicated the issue of Puerto Rico's political status; and that they were continued through May 1992 after the plaintiff announced his candidacy for Resident Commissioner. *Id.* ¶¶ 16–20.

The plaintiff further alleges that several aspects of the Committee's procedures were violative of his rights and the rights of other witnesses. These procedures included the interviewing of witnesses in closed sessions during which they were denied the assistance of counsel, the issuing of subpoenas without notifying all members of the Committee (particularly those members of the Committee from the NPP), the limiting of access to documents, transcripts, evidence, and reports to only PDP committee members and their aides (even after the Supreme Court of Puer-

---

5. The official English translation is not yet available.

to Rico ordered that NPP members were to be afforded the same access to such information), and the denying of access and review of the transcripts to witnesses prior to their testimony. *Id.* ¶¶ 22–26. In addition, the plaintiff alleges that the PDP improperly used public funds to purchase broadcast time to disseminate the hearings. In short, the plaintiff charges that the Committee sought to create the impression that he "was an 'assassin or murderer' and therefore responsible for the death of the two young men at Cerro Maravilla." *Id.* ¶ 36.

Plaintiff's allegations are not limited to conduct directly associated with the hearings, however. He also alleges that the defendants and the rest of the PDP leadership developed a libelous campaign against him throughout the island. *Id.* ¶ 36. Specifically, he alleges:

> Defendants have continually disseminated demeaning, false, and harmful information concerning plaintiff outside the chambers of the Legislature and its forum and beyond the scope of the proper duties and functions of the Committee, its investigative or reporting functions, through television broadcasts paid by government funds, press releases and interviews provided and undertaken at the Legislature in public areas and at television studios, political speeches given to the public in various towns throughout the Island, press releases distributed to various news media sources around the Island and outside the Island of Puerto Rico, and written and oral communications to the United States Senate and Congress, government agencies, including federal department and agencies, federal executives and executives of the federal executive branch.

*Id.* ¶ 54. In general, the plaintiff alleges that "[t]he Committee's conduct … converted what would have been an otherwise valid senatorial investigative hearing into an invalid, improper, or illegal senatorial lynching of character." *Id.* ¶ 59. In particular, he alleges that defendants Rigau and Miguel Hernández Agosto, the President of the Senate, conspired to ruin his reputation, and that defendant Pérez Viera knowingly disseminat-

ed false information to the public about him. *Id.* ¶¶ 32, 37, 49.

The plaintiff invokes the jurisdiction of this Court based on alleged violations of his rights under 42 U.S.C. § 1983 and the First, Fifth, and Fourteenth Amendments of the United States Constitution, and based on an alleged conspiracy to deprive him of these rights under 42 U.S.C. § 1985(3). He also asks this Court to exercise its supplemental jurisdiction to hear his claims under Puerto Rico law for libel and slander. He requests damages in excess of $45 million, plus punitive damages, costs, and attorneys' fees. Defendants have moved for the dismissal of the complaint on grounds that (i) they are protected by the doctrine of legislative immunity, and (ii) the complaint's allegations are insufficient to establish either an actionable violation of the plaintiff's constitutional rights or a conspiracy to deprive him of such rights.

## II. The Rule 12(b)(6) Standard

■ Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that a defendant may, in response to an initial pleading, file a motion to dismiss the complaint for failure to state a claim upon which relief can be granted. It is well-settled, however, that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *see also Miranda v. Ponce Federal Bank,* 948 F.2d 41, 44 (1st Cir.1991). The Court must accept as true the well-pleaded factual averments contained in the complaint, while at the same time drawing all reasonable inferences from the allegations in favor of the plaintiff. *See McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 276, 96 S.Ct. 2574, 2576–77, 49 L.Ed.2d 493 (1976); *Correa–Martínez v. Arrillaga–Beléndez,* 903 F.2d 49, 51 (1st Cir.1990); *Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 16 (1st Cir. 1989). However, a "complaint must be anchored in a bed of facts, not allowed to float freely on a sea of bombast." *Miranda,* 948 F.2d at 44. Therefore, when evaluating the sufficiency of a complaint, a Court must not accept the matters alleged on blind faith. *Id.*

## III. Legislative Immunity

In their motion to dismiss the defendants argue not only that the plaintiff has failed to state a claim under which relief can be granted, but also that they enjoy a broad and complete immunity for all claims presented in the complaint. The issues presented in the motion to dismiss and its opposition require us to review the scope of the Speech and Debate Clause of the Constitution, federal common law, Puerto Rico law, as well as the legislative informing function. In particular, the Court will examine how these sometimes overlapping doctrines work, and how they apply to the case at bar. The Court will review each of these doctrines in turn.

### A. Speech or Debate Clause Immunity

The United States Constitution provides, at Article I, Section 6, that "Senators and Representatives ... shall ... for any Speech or Debate in either House ... not be questioned in any other Place." This Speech or Debate clause provides broad protection for all members of Congress. As one commentator explained:

> The speech or debate clause protects Congress from two kinds of threats to its deliberative autonomy. First, it blocks attempts by executive officials to use grand jury investigations and criminal prosecutions as means of calling into question 'the legislative acts of ... members of Congress.' Second, and more generally, the clause insures 'that legislators are not distracted from or hindered in the performance of their legislative tasks by being called into court to defend their actions.'

L. Tribe, *American Constitutional Law* § 5–18, p. 370 (2d ed. 1988) (footnotes omitted). At its core, the Clause seeks to protect legislative independence in a governmental system based on the separation of powers. Rotunda & Nowak, *Treatise on Constitutional*

*Law: Substance and Procedure* § 8.6 (2d ed. 1992).

██ The Clause provides members of Congress with an absolute immunity which shields them from any sort of attack based on their "legislative acts"—that is, acts which are "an integral part of the deliberative and communicative process by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel v. United States*, 408 U.S. 606, 625, 92 S.Ct. 2614, 2627, 33 L.Ed.2d 583, *reh'g denied*, 409 U.S. 902, 93 S.Ct. 98, 34 L.Ed.2d 165 (1972). On the other hand, the Clause provides no protection for activities which are essentially "political in nature" because the clause "does not prohibit inquiry into activities that are casually or incidentally related to legislative affairs but not a part of the legislative process itself." *United States v. Brewster*, 408 U.S. 501, 528, 92 S.Ct. 2531, 2545, 33 L.Ed.2d 507 (1972).[6] In determining whether a particular activity is protected, a court must consider whether the activity is essential to the legislature's deliberations or whether permitting inquiry into the activity would threaten its integrity and independence. *Id.* at 602–03.

Protecting the integrity and independence of the legislature is the primary purpose of the immunity, which provides security against "possible prosecution by an unfriendly executive and conviction by a hostile judiciary." *United States v. Johnson*, 383 U.S. 169, 179, 86 S.Ct. 749, 754, 15 L.Ed.2d 681 (1966); *see also Silva v. Hernández Agosto*, 18 T.P.R. 55 (1986) (the purpose of the immunity is to protect the legislative branch from improper interventions by the executive or judicial branch and to allow legislators to work freely on the floor without fear of being sued for their official actions). Its function is

---

**6.** In addition to literally speaking and debating, protected "legislative" activities may include voting, preparing committee reports, and conducting committee hearings. Unprotected "political" activities include providing constituent services, aiding individuals seeking government contracts and arranging appointments with government agencies. Tribe, *supra*, § 5–18, pp. 371–72; *see*

*also Romero Barceló v. Hernández Agosto*, 15 T.P.R. 487, 500 (1984) (citations omitted) ("the 'sphere of legitimate legislative activity' includes what takes place during the debates, informative sessions, investigations and other acts which occur on the legislative floors or in the committee rooms").

not to benefit individual legislators "but to protect the integrity of the legislative process by insuring the independence of individual legislators." *Brewster*, 408 U.S. at 507, 92 S.Ct. at 2535. The immunity, where applicable, is absolute, so that "[a] claim of unworthy purpose does not destroy the privilege." *Tenney v. Brandhove*, 341 U.S. 367, 377, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1951), *reh'g denied*, 342 U.S. 843, 72 S.Ct. 20, 96 L.Ed. 637 (1951). Courts are prohibited from "inquir[ing] into the motives of legislators" and "should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province." *Id.* at 377–78, 71 S.Ct. at 788–89. Such an approach is essential because:

> Like any privilege, the one the speech and debate clause grants Congress would be virtually worthless if courts adjudging its applicability had to scrutinize closely the acts ostensibly shielded. Judicial consideration of alleged improper motivation is thus necessarily an inappropriate mode of analysis for determining the limits of legislative immunity. Similarly, since judgments of legality or constitutionality obviously involve "questioning" of legislative acts, courts may not strip acts taken in the legislative process of their constitutional immunity by finding that the acts are substantively illegal or unconstitutional.

Tribe, *supra*, at 372.

### B. Common Law Immunity

■■■ The immunity provided by the Speech or Debate Clause applies, by its own terms, only to federal legislators. In the case of *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), however, the Supreme Court held that as a matter of federal common law a similar immunity protects state legislators. The Court found that the immunity, which is rooted in the English parliamentary struggles of the sixteenth and seventeenth centuries as well as American colonial history, is essential for *all* legislators " 'in order to enable and encourage a representative of the public to discharge his public trust with firmness and success.' " *Id.* at 373, 71 S.Ct. at 786 (quoting II *Works of*

*James Wilson* 38 (Andrews ed. 1896)). This federal common law immunity protects legislators in Puerto Rico. *See, e.g., Colón Berríos v. Hernández Agosto*, 716 F.2d 85 (1st Cir.1983); *Martínez Acosta v. Hernández Agosto*, 590 F.Supp. 144 (D.P.R.1984) (Pieras, D.J.); *Thompson v. Ramírez*, 597 F.Supp. 727 (D.P.R.1984).

The Supreme Court has noted important differences between the concerns underlying the constitutional and the common law immunities which require more limited application of common law immunity in certain contexts. For example, the Court has held that the separation of powers concerns which underlie constitutional immunity—and which are not an aspect of the common law immunity—dictate that federal lawmakers enjoy a broader privilege than their state counterparts in federal criminal actions. *Accord United States v. Gillock*, 445 U.S. 360, 100 S.Ct. 1185, 63 L.Ed.2d 454 (1980). The Court has also held, however, that when faced with civil rights actions under Section 1983, state legislators are entitled to the same immunity enjoyed by members of Congress under constitutional immunity. *Accord Supreme Court of Virginia v. Consumers Union of the United States*, 446 U.S. 719, 733, 100 S.Ct. 1967, 1975, 64 L.Ed.2d 641 (1980) (citations omitted). Since this action is predicated on federal civil rights law, the Court will accord the defendants the full measure of the federal common law immunity.

### C. Puerto Rico Immunity

■■ The Constitution of the Commonwealth of Puerto Rico provides, in Article III, Section 14, that "[t]he members of the Legislative Assembly shall not be questioned in any other place for any speech, debate or vote in either House or in any committee." The plaintiff concedes that this clause provides an independent basis on which the defendants may claim immunity. He argues, however, that based on the language of the clause as interpreted by the Puerto Rico Supreme Court, the immunity derived from Section 14 "is much more restricted than the immunity of the members of the Congress of

the United States."[7]

The legislative history behind Section 14 clearly indicates its close relationship with the Speech or Debate Clause. *In re Rodríguez Torres,* 6 T.P.R. 972, 994 (1978). Section 14 was drafted after considering the Supreme Court's *Kilbourne* decision and other related precedents and materials, including the legislative history of the Speech or Debate Clause and its roots in the English Bill of Rights. *Id.* at 993. The Supreme Court of Puerto Rico has stated not only that Section 14 "is clearly related to the clauses on parliamentary immunity of the Anglo-Saxon tradition," but also that the drafters of the clause were aware of the subsequent case law construing the clause. *Id.* at 995 (citations omitted); *see also Silva v. Hernández Agosto,* 18 T.P.R. 55 (1986) (Section 14 was adopted based on the North American experience and a similar disposition contained in the U.S. Constitution). The Supreme Court of Puerto Rico has consistently looked to cases construing the Speech or Debate Clause to provide guidance on the application of Section 14. *See, id.; Romero Barceló v. Hernández Agosto,* 15 T.P.R. 487 (1984); *Vélez Ramírez v. Colberg Ramírez,* 17 T.P.R. 1047 (1986).

Moreover, the Supreme Court of Puerto Rico has stated that "[t]he main purpose of the immunity clause [of the Constitution of the Commonwealth of Puerto Rico] is to guarantee the independence of the Legislative Branch and hence strengthen the separation of powers." *Romero Barceló,* 15 T.P.R. at 501. The immunity thus "covers legislative functions derived from the separation of powers." *Id.* at 512. As a result, the separation of powers concerns which drive the Speech or Debate Clause immunity underlie Section 14 immunity as well; therefore, contrary to plaintiff's contention, the Puerto Rico immunity is co-extensive with the immunity provided to members of Congress.

In conclusion, the application in this case of the doctrine of legislative immunity is somewhat complicated because of the interplay between the Speech or Debate Clause immunity, the federal common law immunity, and the Puerto Rican constitutional immunity. The Speech or Debate Clause, which provides an absolute immunity for federal legislators that shields them from attacks based on their legislative acts, is not applicable to state legislators, including legislators in Puerto Rico (*accord Romero Barceló,* 15 T.P.R. at 501), and therefore provides no protection for the defendants in this case. However, both the federal common law immunity and the Puerto Rico constitutional immunity do apply in this case and afford the defendants protection at a level equivalent to that provided by the Speech or Debate Clause immunity. Moreover, the cases demonstrate that in applying the federal common law immunity and the Puerto Rican constitutional immunity in this case, the Court should be guided by the Speech or Debate Clause immunity and its construing case law. As a result, the Speech or Debate Clause immunity, while not strictly applicable, is nonetheless the applicable rule of law in this case.

## D. Legislative Informing Function

When a legislature seeks to inform itself, through hearings, investigations, or otherwise, about the acts and dispositions of the administrative agents of the government, it is undoubtedly engaging in a core legislative function. As President Woodrow Wilson wrote:

It is the proper duty of a representative body to look diligently into every affair of government and to talk much about what it sees. It is meant to be the eyes and the voice, and to embody the wisdom and will of its constituents. Unless Congress has and uses every means of acquainting itself with the acts and the disposition of the administrative agents of the government, the country must be helpless to learn how it is being served; and unless Congress both scrutinizes these things and sift them by every form of discussion, the country must remain in embarrassing, crippling ignorance of the very affairs which it is most important that it should understand and direct. *The informing function of Con-*

---

7. Plaintiff's Memorandum in Opposition to Motion to Dismiss, p. 9.

*gress should be preferred even to the legislative function.*

W. Wilson, *Congressional Government* 303 (1885) (emphasis added). The modern political history of the United States reflects several instances of legislative investigations— including the past hearings concerning Watergate and the Iran–Contra Affair, as well as the hearings concerning the conduct of the Federal Bureau of Investigation during the Branch Davidians hostage situation in Waco, Texas—which demonstrate the increasing importance of the informing function.

The Supreme Court of Puerto Rico summarized the nature of the informing function as follows:

> Among its many essential functions, a legislature, besides drafting laws, exercises the power of overseeing the government, discussing matters of general interest, and informing the country of current public affairs.
>
> The power to legislate, oversee, investigate, debate, and inform stems from the very concept of a tripartite government, interdependent but separate from the other, and each of equal hierarchy.
>
> The functions of investigation, overseeing, debate, and information are not subordinate to the function of legislation. For example, a debate or the transmission of a debate, is not validated by the drafting of a law. These other functions are justifiable in themselves insofar as they contribute to a representative assembly's discharge of its constitutional role.

*Romero Barceló,* 15 T.P.R. at 496.

■ Because legislative investigations involve core legislative functions, all actions of individual legislators in conjunction with such investigations are immune from prosecution. *Accord Hutchinson v. Proxmire,* 443 U.S. 111, 132, 99 S.Ct. 2675, 2686–87, 61 L.Ed.2d 411 (1979). In fact, their actions are protected even in situations in which, had they been conducted outside the legislative sphere, the conduct would have been deemed unconstitutional or would have resulted in civil or criminal liability. *Accord Tenney, supra* (legislators immune despite the fact that they impinged on plaintiff's right to free speech).

■ The informing function does not, however, include communications by legislators to the public or to other legislators of information regarding their legitimate activities. As a result, the immunity does not protect a legislator's "defamatory statements scattered far and wide by mail, press, and the electronic media." *Hutchinson,* 443 U.S. at 132, 99 S.Ct. at 2686. For example, in *Hutchinson* a U.S. Senator published a press release based on a speech he gave on the senate floor in which he ridiculed research conducted by a scientist. The Senator considered the experiment a waste of taxpayer's money, and he so stated on the senate floor, in press releases and newsletters, in a television interview, and even on phone calls made to the federal agencies funding the scientist's research. The scientist brought a defamation action against the Senator in federal district court. The district court dismissed the complaint because it believed that the Speech and Debate Clause provided the Senator with complete immunity, and the court of appeals affirmed. The Supreme Court of the United States reversed, holding that the Senator could be held liable for comments made outside the senate floor. *Id.* at 133, 99 S.Ct. at 2687. "[N]othing in history or in the explicit language of the Clause suggests any intention to create an absolute privilege from liability or suit for defamatory statements made outside the [legislative] Chamber." *Id.* at 127, 99 S.Ct. at 2684. Indeed, the Court made it clear that claims of immunity which try to go beyond what is necessary to preserve the independence of the legislature will be strictly scrutinized by the Court. Therefore, statements made during radio and television interviews, in newsletters, during telephone calls, and in press releases are not protected because they are not "part of the legislative function or the deliberations that make up the legislative process." *Id.* at 121 n. 10, 133, 99 S.Ct. at 2681, n. 10, 2687.

### E. Discussion

■ It is beyond dispute that the Cerro Maravilla hearings fell well within the legitimate legislative sphere. As the First Circuit explained:

The hearings were properly authorized by Puerto Rico Senate Resolution 91 (Feb. 22, 1981) which provides a specific mandate to the Senate Judiciary Committee to inquire into the activities of the police and other agencies of the government leading up to and during the Cerro Maravilla incident as well as the behavior of the executive branch in response to the incident.

Investigations such as this Senate Judiciary Committee investigation constitute an essential component of the legislative process.

*Colón Berríos v. Hernández Agosto,* 716 F.2d 85, 90 (1st Cir.1983) (citation omitted). The defendants are therefore immune from any civil or criminal prosecution based on conduct directly related to the Cerro Maravilla investigations.[8] Consequently, all of plaintiff's claims regarding allegedly unconstitutional procedures employed by the Committee relating to the issuance of subpoenas, the examination of witnesses, and the gathering of evidence, as well as his claims regarding the allegedly unlawful use of public funds to broadcast the hearings and regarding slanderous comments allegedly made by the defendants during the hearings must be **DISMISSED**.

■ Plaintiff's assertion that the defendants abused their positions and, solely political reasons, slanted or manipulated the testimony offered during the hearings to portray the plaintiff in a negative light, cannot provide a basis to destroy the application of the privilege in this case. *Accord Tenney, supra.* The Court simply may not consider defendants' motives. The separation of powers doctrine provides the judicial branch with certain responsibilities in monitoring the conduct of other branches of government, but does not provide the power or duty to act as referee in a dispute between the Executive and the Legislature. The Constitution reserves for the electorate the power to moderate such political disputes and to enter their judgment at the ballot box. The plaintiff made public his dissatisfaction with the conduct of the defendants and the PDP leadership in relation to the Cerro Maravilla hearings. He and his party are now in control of the government—in part, perhaps, because the electorate was also unhappy with the way in which the hearings were conducted. If the defendants have in fact abused their positions, no degree of censure which any court could impose upon them would be more just and effective than the punishment meted out by the citizens of Puerto Rico in November 1992.

■ On the other hand, defendants' alleged dissemination of false, defamatory, and slanderous information about the plaintiff through press releases, interviews, and speeches occurring outside the strict scope of their legislative duties, is not similarly protected by the immunity. *Accord Hutchinson, supra; see also Gravel, supra* (although immunity protected legislator who introduced classified materials during subcommittee hearings, it did not encompass his private arrangement to publish the documents); *Doe v. McMillan,* 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973) (information derived from a valid legislative function is not automatically protected for all types of public dissemination). Plaintiff's claims based on such extra-legislative actions cannot be dismissed on immunity grounds.

## IV. Civil Rights Claims

Since the defendants have successfully established their legislative immunity for any acts which occurred within the legislative forum, the Court must now consider whether plaintiff's claims based on extra-legislative actions should be dismissed on grounds that he has failed to state a claim on which relief can be granted under the civil rights statutes which form the substantive and jurisdictional

---

8. The protection afforded by the legislative immunity doctrine extends to defendant Pérez Viera as chief counsel and investigator for the Senate Judiciary Committee. *Accord Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975) (quoting *Gravel v. United States,* 408 U.S. 606, 616–17, 92 S.Ct. 2614, 2622–23, 33 L.Ed.2d 583 (1972) (activities of the chief counsel of a Senate subcommittee are protected if they fall within the legitimate legislative sphere because, "[i]n *Gravel* we made it clear that 'the day-to-day work' of such aides is so critical to the Members' performance that they must be treated as the [Members'] alter egos.")).

core of the complaint. Therefore, when examining defendant's motion to dismiss as to these extra-legislative acts, the Court will only take into consideration those allegations made in the complaint which are not precluded by legislative immunity.

## A. Section 1983

■ Title 42, United States Code, Section 1983 provides for the recovery of damages and injunctive relief against individuals and governmental bodies who deprive a person of rights, privileges, or immunities secured by the Constitution and laws of the United States.[9] To establish a cause of action under Section 1983, the plaintiff must demonstrate that the defendants owed him a constitutional duty and that the duty was breached. Therefore, an analysis of this issue requires consideration of the standards of care imposed upon public officials under the constitutional provisions which the plaintiff alleges were violated.

### 1. Fourteenth Amendment Due Process Clause

■ The plaintiff alleges violations of his due process rights under the Fourteenth Amendment of the United States Constitution. To prove such a violation a plaintiff must show a deprivation of life, liberty or property. Unless the injury suffered by the plaintiff can be so classified, no constitutionally protected interest is at risk and, in the absence of any alternative theory of right, an action under section 1983 will not lie. 2 Cook & Sobieski, *Civil Rights Actions* ¶ 7.05[B] (Bender 1992). The plaintiff alleges that he has suffered a deprivation of his "liberty" interest in his good name and reputation because of the defamatory statements made by the defendants. Complaint ¶¶ 12, 13.

■ The Supreme Court, in *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), held that defamation by a state actor, standing alone, does not tread on any protected "liberty" interest and therefore does not give rise to an action under Section 1983. In *Paul*, Kentucky police officers distributed a flyer to local businessmen during the holiday season containing pictures of active shoplifters. Plaintiff's picture was included in the flyer because at the time the plaintiff had been charged with shoplifting. Soon thereafter, the charges were dismissed. However, plaintiff's employer received a copy of the flyer and warned the plaintiff that if anything similar happened again he would be fired. The plaintiff filed a Section 1983 claim against the police department, and the district court dismissed the complaint for failure to state a claim. The court of appeals reversed, finding that the plaintiff had stated a valid cause of action. The Supreme Court reversed, and held that the protection of the Due Process Clause was not implicated by the facts presented. The Court made it clear that Section 1983 does not make actionable wrongs committed by government employees, unless they impair constitutionally protected interests. *Id.* at 700–01, 96 S.Ct. at 1160–61. "Reputation alone, apart from some more tangible interests such as employment, is neither liberty or property by itself sufficient to invoke the procedural protection of the Due Process Clause." *Id.* at 701, 96 S.Ct. at 1161. In order for defamation to become a constitutional deprivation, another right or status previously enjoyed by the individual must have been lost. *Id.* at 711, 96 S.Ct. at 1165. Thus, the Court will only recognize a constitutional violation as an actionable Section 1983 claim when defamation by a government actor is accompanied, for example, with a loss of employment. Since the plaintiff in *Paul* was not dismissed from his job, the Court found that the plaintiff did not have a Section 1983 claim for defamation.

■ Following the precedent established by the Supreme Court in *Paul*, the First Circuit had an opportunity to deal with the same issue in *Beitzell v. Jeffrey*, 643 F.2d 870 (1st Cir.1981). In *Beitzell*, the University of

9. 42 U.S.C. § 1983 provides in part as follows: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to any deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Maine denied tenure to an assistant professor. The professor brought a Section 1983 civil rights action against various university officials alleging that the officials deprived him of liberty and property without due process of law when they denied him tenure and when they made public false and stigmatizing charges of excessive drinking. The First Circuit recognized that the Constitution protects a person against a severely defamatory charge that might seriously damage his standing in the community. However, before the injury is constitutionally recognizable, the injury to reputation must be great and it must be accompanied by a change in the injured person's status or rights. *Id.*, at 878. Therefore, defamation by a state actor *may* be actionable where:

> [T]he injury to reputation [is] accompanied by a change in the injured person's status or rights (under substantive state or federal law), perhaps as a touchstone (or concrete evidence) of the fact that the injury to reputation was inflicted as a result of *a conscious government policy* and is serious enough to interfere with other liberties of the sort suggested in *Meyer* [*v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), such as the right to engage in any of the common occupations of life or to marry, establish a home, and bring up children].

*Id.* (emphasis added). The First Circuit concluded that the Fourteenth Amendment protects a person's interest in his reputation but "only where (1) government action threatens it, (2) with usually serious harm, (3) as evidenced by the fact that employment (or some other right or status) is affected." *Id.* (citation and footnote omitted). If a plaintiff satisfies these three requirements, a Section 1983 claim will lie against the appropriate government officials. However, based on the complaint, the court in *Beitzell* found no constitutional violation because the allegedly defamatory statements were never made in public.

As in *Paul* and *Beitzell*, the plaintiff herein has not presented a cognizable Section 1983 claim for a violation of his liberty interest in his reputation. An analysis of the factors enumerated in *Beitzell* is in order. First, the plaintiff alleges that the defendants, during and after Committee hearings on the Cerro Maravilla murders, made numerous libelous statements outside of the legislative forum. For example, the plaintiff alleges that the defendants called him an "assassin," "murderer," and "liar," and accused him of committing perjury and engaging in a conspiracy to cover up the murders that took place at Cerro Maravilla. Complaint ¶¶ 36, 54, 56. These alleged libelous statements were made in television studios, in political speeches made throughout the island, and in political press releases. *Id.* at 54. However, while the defendants accused of making these statements were members of the Puerto Rico Senate directly involved in the Cerro Maravilla hearings, the alleged statements as presented in the complaint reflect nothing more than individual conduct undertaken by each defendant. This alleged conduct cannot be characterized as "government policy" or "government action." The complaint reflects no contention that in making the alleged statements any of the defendants presented themselves as speaking on behalf of the Committee or any other government entity. In fact, the complaint does not even attempt to explain how defendants' conduct can be characterized as government action. Therefore, the injury which plaintiff's reputation may have suffered as a result of these statements, while perhaps actionable under the Puerto Rico Civil Code provision of libel and slander, is not of a character which is actionable under Section 1983.

Second, even if defendants' actions could somehow be characterized as "government action," the plaintiff cannot show that defendants' actions caused him serious harm. In 1992, immediately after the last barrage of allegedly libelous statements, the plaintiff was elected Resident Commissioner; the position he now holds. In fact, the only serious harm which the Court could infer from the complaint, but which is not specifically alleged, is that the plaintiff lost his bid for re-election in 1984 when he ran for a third term as Governor of Puerto Rico. *See* Election Result Certification by the State Election Commission for the office of Governor, De-

cember 22, 1984.[10] However, even if the plaintiff had made such an allegation in the complaint, the claim would be barred by the applicable statute of limitations since the plaintiff lost that election over eight years before he filed this action. *See Wilson v. García*, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985) (statute of limitations for all civil rights actions is the statute used in the forum state for personal injury torts); *Ramírez Morales v. Rosa Viera*, 815 F.2d 2 (1st Cir.1987) (statute of limitations for civil rights actions in Puerto Rico is one year); 31 L.P.R.A. § 5298. Therefore, plaintiff's complaint does not meet the requirements established by the First Circuit in *Beitzell* to invoke the protection of the Fourteenth Amendment.

■ The plaintiff also alleges a deprivation of his right to be free from attacks against his reputation based not only on federal law, but also on his right to be free from "abusive attacks on his honor, reputation and private or family life" as established by Article II, Section 8 of the Puerto Rico Constitution.[11] Since Section 1983, by its own terms, protects against deprivations only of *federally* created rights, privileges or immunities *(accord* 42 U.S.C. § 1983; *see also González v. González*, 385 F.Supp. 1226 (D.Puerto Rico 1973), *vacated on other grounds*, 536 F.2d 453 (1st Cir.1976)), a violation of Section 8, standing alone, cannot form the basis of a valid Section 1983 action. However, the Fourteenth Amendment operates as a conduit through which state-created rights are also protected, since the interests "compre-

hended within the meaning of either 'liberty' or 'property' as meant in the Due Process Clause attain this constitutional status by virtue of the fact that they have been initially recognized and protected by state law." *Accord Paul v. Davis*, 424 U.S. at 711, 96 S.Ct. at 1165. The procedural guarantees of the Fourteenth Amendment apply, and Section 1983 may therefore be invoked, "whenever the State seeks to remove or significantly alter [such rights]." *Id.* Therefore, although a 1983 action cannot be used to vindicate the rights established under Section 8, it can be used to insure that such rights were not deprived without due process of law. *See Johnson v. Rodríguez*, 943 F.2d 104, 109 (1st Cir.1991), *cert. denied*, 502 U.S. 1063, 112 S.Ct. 948, 117 L.Ed.2d 117 (1992) (citing *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) (alteration or extinction of a state-created right occurs when the state contravenes clear and unequivocal requirements and thus fails to satisfy either the federal Constitution or state law).[12]

Assuming, without deciding, that Section 8 raises the interest in one's honor and reputation, standing alone, to a constitutional level at which it cannot be abridged by a state actor under *any* circumstances without due process of law, the Court nonetheless finds that Section 8 cannot form the basis for a valid Section 1983 claim in this action. As the Supreme Court explained in *Paul*, the procedural guarantees of the Fourteenth Amendment apply only when some state action threatens injury to some important right. Without state action there can be no

---

**10.** The results for the Puerto Rico 1984 election for the Governor's seat were as follows: Rafael Hernández Colón—PDP—822,783; Carlos Romero Barceló—PNP—768,742; Hernán Padilla—PRP—69,865; Fernando Martín García—PIP—61,316. *See* Election Result Certification by the State Election Commission for the Office of Governor, December 22, 1984.

**11.** Article II, Section 8 provides:

Every person has the right to the protection of law against abusive attacks on his honor, reputation and private or family life.

This provision is the main source of protection against libel and slander under Puerto Rico law. *Accord Cortés Portalatín v. Hau Colón*, 3 T.P.R. 1019 (1975). The terms of Puerto Rico Libel and Slander Act of 1902, which is codified at 32

L.P.R.A. §§ 3141–3149, survive only insofar as they are compatible with Section 8. *Id.*

**12.** An area in which Section 1983 has been frequently used to vindicate a state-created right is that of the suspension or denial of a driver's license, where courts have held that, absent an emergency, the denial or suspension of a license without the opportunity for a hearing violates due process. *See, e.g., Raper v. Lucey*, 488 F.2d 748 (1st Cir.1973); *Harris v. Colorado*, 516 F.Supp. 1128 (D.Colo.1981); *Pollard v. Panora*, 411 F.Supp. 580 (D.Mass.1976). It has also been held that deprivation of the state-created right to secure counsel and have a hearing prior to being committed to a mental institution without due process is actionable under Section 1983. *Accord Campbell v. Glenwood Hills Hospital, Inc.*, 224 F.Supp. 27 (1963).

cause of action for a Fourteenth Amendment due process violation. Since the plaintiff has failed to establish that defendants' conduct can be characterized as government action, no due process violation has been presented for the Court's consideration.

■ As a result, the plaintiff cannot recover under federal law for any injury to his reputation and his claim under Section 1983 for deprivation of his due process rights must be DISMISSED. The parties must understand, however, that plaintiff's efforts to recover in this Court for the alleged injuries to his reputation fail for jurisdictional reasons, not because he cannot make out a claim for libel or slander or because defendants' conduct is absolutely immune.[13] For example, to prove libel or slander under the Puerto Rico Civil Code, the plaintiff would have to show a public and malicious defamation tending to subject him to public hatred or contempt, a deprivation of the benefit of public confidence or social intercourse, or an injury to his business. 32 L.P.R.A. § 3142. The comments allegedly made by the defendants to the effect that the plaintiff was involved in the murders at Cerro Maravilla or in subsequent efforts to cover up the event, if proved by clear and convincing evidence, would be found actionable since a publication is libelous per se when it imputes the commission of an offense. *Accord Bosch v. El Imparcial, Inc.,* 87 P.R.R. 269 (1963) (discussing libel per se); *Conjugal Partnership v. López,* 16 T.P.R. 142 (1985) (clear and convincing evidence required where plaintiff is a public figure). The defendants would then only be left with the defense that their statements were the truth. *Accord* 32 L.P.R.A. § 3146. Since the defendants have, in an unrelenting effort to establish a nexus between the plaintiff and the Cerro Maravilla killings, spent 12

years and millions of dollars of public funds and have failed to bring an indictment or other formal accusation against the plaintiff while having complete control over the House, Senate, and the Executive, the logical conclusion is that the plaintiff is completely innocent of all accusations against him regarding the Cerro Maravilla incident. Therefore, "truth" would be an unlikely defense in this instance.

### 2. First Amendment

■ The plaintiff also alleges violations of his rights of freedom of speech and association under the First Amendment of the United States Constitution. Courts have not developed a well-defined calculus through which to view Section 1983 claims based on First Amendment violations. Rather, they have recognized certain discrete areas in which government action may be curtailed or overturned based on perceived violations of an individual's right to free expression. For example, courts have restricted on First Amendment grounds the termination of public employment based upon the failure to support the prevailing political party (*accord Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990)) and the termination of public employees as retaliation for engaging in disfavored speech activities (*accord Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315, *reh'g denied,* 483 U.S. 1056, 108 S.Ct. 31, 97 L.Ed.2d 819 (1987); *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)).[14] Similar pro-

---

**13.** *See also* Rodney A. Smolla, *The Displacement of Federal Due Process Claims by State Tort Remedies,* 1982 U.Ill.L.F. 831, 841–47 ("[A Section 1983] action shifts the substantive focus of the lawsuit away from the two issues that have always been at the core of libel actions: the truth or falsity of the defamatory language, and the conduct of the defendant in publishing it.... Substantive law aside, the critics of *Paul* have also failed to build a convincing case for construing the fourteenth amendment as mandating an alternative federal forum for what are essentially defamation actions").

**14.** *See also Navarette v. Enomoto,* 536 F.2d 277 (9th Cir.1976), *rev'd on other grounds, Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978) (intentional and negligent interference with First Amendment right of inmate to send mail is actionable); *Trotman v. Board of Trustees,* 635 F.2d 216 (3d Cir.1980) (sending of telegram by university officials to the effect that faculty picketing would constitute a cause for discipline up to and including dismissal found actionable).

tection has never been afforded to a politician whose rights to freedom of speech, freedom of association, and freedom "to disassociate [oneself] from unpopular views"[15] have been injured by other politicians seeking to undermine his credibility within his own party and with the electorate.

The plaintiff has not clearly articulated the contours of the alleged injuries to his First Amendment rights. It appears that he is seeking a determination that his right to free speech was chilled and his right to associate with the NPP was adversely affected by the defamatory statements made by the defendants. The exact nature of plaintiff's claims is not important—although the Court notes that given the fact that he was elected Resident Commissioner on the NPP ticket, his claims regarding injury to his right to associate with the NPP ring hollow.

Plaintiff's First Amendment claim can be viewed in two ways. First, it can be viewed as an attempt to recover damages inflicted upon him by the defendants' statements. Viewed in this light, it is no more than a simple case for defamation that is actionable in the local courts but not in this forum. On the other hand, it can be viewed as an attempt to have the Court provide protection for him, under the auspices of the First Amendment, in a political dispute between the two major political parties in Puerto Rico. Without engaging in an elaborate discourse on the freedoms of expressions and association, the Court finds that employing the First Amendment to limit or control political discourse would be antithetical to its most basic purposes. As the Court has already noted, in situations in which two political branches of government are involved in a struggle for the hearts and minds of the electorate, the judiciary may not impose its will.

Either way the claim is viewed, therefore, the Court cannot perceive, and the plaintiff has not adequately shown, any way in which it can be seen as setting forth a claim of injury to his First Amendment rights actionable under Section 1983. As a result, this claim must also be **DISMISSED.**

### B.   Section 1985(3)

■ Title 42, United States Code, Section 1985(3) provides a person with the right to institute an action for recovery of damages against anyone who formed part of a conspiracy within any State or Territory of the United States to deprive that person of the equal protection of the laws, or of the equal privileges and immunities under the law.[16] The historical background of Section 1985, enacted after the passage of the Thirteenth Amendment, shows that it was created primarily to protect the rights of Black persons to be free from the acts of individuals who sought to deprive them of their constitutional rights. *See* 1 Antieau, *Federal Civil Rights Acts,* § 260, p. 451–52 (2 ed. 1980). From its more limited beginnings, Section 1985 has been expanded to protect all individuals from deprivations of their federal rights. *Id.* The statute now provides "a cause of action for individuals deprived of their federal rights by conspiracies of either public officials or private persons." *Id.* at 452 (citing *Huey v. Barloga,* 277 F.Supp. 864 (N.D.Ill.1967) (civil rights action against trustees, employees, and agents of town for failure to provide for

---

**15.** The plaintiff has not fleshed out the nature of his right "to disassociate himself from unpopular views." The First Amendment does protect the right of individuals not to be compelled to be associated with particular ideas. For example, in *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), the Supreme Court held that a New Hampshire resident had a right to cover a "Live Free of Die" motto on his license plate on grounds that requiring him to display the motto would violate his right "to refrain from speaking." In this case, however, there is no indication that the defendants compelled the plaintiff to advocate either an unpopular or any other type of view.

**16.** 42 U.S.C. § 1985(3) provides in part as follows:

[I]n any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

personal safety of plaintiff's son dismissed for failure to state a conspiracy claim)).

■ A plaintiff will prevail in a Section 1985(3) action only if he can prove both that a conspiracy existed and that his federally protected rights were deprived by the members of the conspiracy. *See Slotnick v. Staviskey*, 560 F.2d 31 (1st Cir.1977); *Dixon v. City of Lawton*, 898 F.2d 1443, 1449 (10th Cir.1990). Therefore, even in light of a successful Section 1983 claim a plaintiff will not succeed on a Section 1985(3) claim without proving the existence of a conspiracy. Moreover, in general terms, a plaintiff alleging a Section 1985(3) violation must plead and prove the following:

> (a) the existence of a conspiracy, (b) intended to deny the plaintiff or plaintiffs equal protection of the laws, or equal privileges and immunities under the laws, (c) injury or deprivation of federally protected rights to the plaintiff or plaintiffs, (d) an overt act in furtherance of the object of the conspiracy, and (e) some racial or otherwise class-based invidiously discriminatory animus behind the conspirator's action.

Antieau, *supra*, at § 274, p. 473–74; *see also Griffin v. Breckenridge*, 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798–99, 29 L.Ed.2d 338 (1971). After examining these requirements, the Court finds that the plaintiff has failed to assert a cognizable Section 1985(3) claim.

To avoid the filing of frivolous civil rights conspiracy actions, the First Circuit Court of Appeals, among other circuits, requires that plaintiffs allege specific facts in the complaint which would support the existence and scope of the alleged conspiracy. *Slotnick*, 560 F.2d at 33; *Francis–Sobel v. University of Maine*, 597 F.2d 15, 17 (1979); *McGillicuddy v. Clements*, 746 F.2d 76, 77 (1984). Complaints in these types of cases will not survive motions to dismiss "if they contain conclusory allegations of conspiracy but do not support their claims with references to material facts." *Slotnick*, 560 F.2d at 33 (citations omitted). The specific facts provided in the complaint as to the conspiracy are scant at best. The plaintiff alleges that the three main codefendants conspired with each other to launch a negative publicity campaign funded with public funds and to label the plaintiff

as an assassin and murderer in order to end his political career and enhance their own. Complaint ¶¶ 37, 38, 40, 54, 56, 58. These defendants allegedly used their elected political positions to keep the Committee investigations alive, and to reactivate those committee hearings at politically advantageous opportunities. *Id.* at ¶¶ 14, 15, 17, 18, 37. This factual background is insufficient to support a conspiracy civil rights claim in the First Circuit. The complaint is even more deficient when the Court takes into account that the claims of improper motive as to the scheduling of the Committee hearings and the reasons for convening those hearings are precluded from consideration by the Court by the doctrine of legislative immunity. Thus, plaintiffs allegations are basically reduced to a claim that the defendants conspired with one another to deprive him of his liberty interest in his reputation. This allegation, without more, is insufficient to support a conspiracy claim.

For example, in *Francis–Sobel v. University of Maine*, 597 F.2d 15 (1979), a woman sued the University of Maine and the Boston Regional Director of the Equal Employment Opportunity Commission ("EEOC"). The plaintiff alleged discrimination on the basis of race and sex in filling some administrative positions at the university, as well as a conspiracy between the university and the director of the EEOC to delay her claims against the university until the statute of limitations on her claims had passed. The plaintiff alleged various facts to support her Section 1985(3) claim. She filed her complaint with the EEOC on March 31, 1972, but the EEOC did not assert jurisdiction over her complaint until over a year later, in May of 1973. The investigation finally started on August of 1973. In February of 1974 the plaintiff filed a second complaint alleging further discrimination and retaliatory discharge of her husband from the university faculty. The EEOC failed to notify the plaintiff of her filing, failed to notify the university of the charges, and failed to respond to numerous requests by the plaintiff for some action on her complaint. Finally, two years later, the EEOC began processing her complaint in September of 1976. Fifteen days later the EEOC disclaimed jurisdiction over many

charges, found reasonable cause as to only one charge, and found no reasonable cause as to the rest. Based on these allegations the district court dismissed her action for failure to state a claim, and the First Circuit Court of Appeals affirmed finding that the complaint was "devoid of any factual allegations that would tend to link [the plaintiff] with the university defendants." *Id.* at 17. Furthermore, the court of appeals explained that the plaintiff had simply failed to provide even the minimum factual support necessary to plead the existence of a conspiracy. *Id.*

As in *Francis–Sobel,* the plaintiff in this case has failed to provide an adequate factual background that would support a Section 1985(3) conspiracy claim. The plaintiff has in fact tried to plead a Section 1985(3) conspiracy by providing unsubstantiated assumptions of a conspiracy. The plaintiff apparently expects the Court to infer a conspiracy from the allegation that he has been injured by the Cerro Maravilla hearings, and that since the defendants are members of the opposing political party and had substantial control over the Committee hearings, they must have had a conspiracy; a feat of circular logic that this Court will not entertain.

Even if the Court found some support for the conspiracy claim, the plaintiff has not satisfied the other requirements of a Section 1985(3) action as described before. *See Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). The plaintiff has not alleged or proved an overt act in furtherance of the conspiracy. In fact, in light of the legislative immunity enjoyed by the defendants, and the fact that the Court may not consider defendants' motives or actions related to their legislative activities, the plaintiff has only asserted a blind conspiracy allegation. Finally, the plaintiff has not been able to articulate a clear class-based invidious discriminatory animus behind the alleged actions of the alleged conspirators. Without alleging and demonstrating an invidious discriminatory animus behind the actions of alleged conspirators, a Section 1985(3) action will not lie. *Harrison v. Brooks,* 519 F.2d 1358, 1359 (1st Cir.1975) (if a Section 1985(3) action is to be used for non-racially motivated conspiracies, the complaint must allege that the defendants conspired against the plaintiff because of his membership in a class, and the criteria defining the class were invidious). Therefore, all of plaintiff's claims in Count Two must be **DISMISSED.**

## V. Conclusion

All of plaintiff's claims arising out of conduct by the defendants which occurred during the Cerro Maravilla hearings or otherwise in the legislative forum are precluded under the doctrine of legislative immunity. For those claims arising out of statements made by the defendants outside the legislative forum, the plaintiff has failed to state a claim under Section 1983 or Section 1985(3). As a result, defendants' motion to dismiss must be **GRANTED,** and plaintiff's causes of action in Counts One and Two are **DISMISSED WITH PREJUDICE,** while his cause of action in Count Three is **DISMISSED WITHOUT PREJUDICE,** pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Finally, defendants' motion to dismiss also requested the imposition of sanctions and attorney's fees against the plaintiff under Rule 11 of the Federal Rules of Civil Procedure because of the allegedly frivolous nature of the complaint. Defendants' request is hereby **DENIED.**

IT IS SO ORDERED.